UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

   Plaintiff,

          REPORT AND RECOMMENDATION

 vs.

Christopher Colt McDonald,

   Defendant.     Crim. 05-226 (JMR/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Pretrial Motions of the Defendant:

  1. The Defendant's Motion to Suppress Evidence Obtained as a Result of a Search and Seizure.

  2. The Defendant's Motion to Suppress Statements, Admissions, and Answers.

A Hearing on the Motions was conducted on August 31, 2005, at which time, the Defendant Christopher Colt McDonald appeared personally, and by Lyonel Norris Esq., Assistant Federal Defender, and the Government appeared by Lisa D.

Kirkpatrick, Assistant United States Attorney.   For reasons which follow, we recommend that both Motions be denied.

## II. Factual Background

The Defendant is charged with one Count of possessing, with an intent to distribute, in excess of fifty (50) grams or more of methamphetamine (actual), a controlled substance, in violation of Title 21 U.S.C. §§841(a)(1), and 841(b)(1)(A), which is said to have occurred on or about February 16, 2005.  As pertinent to that charge, and to the Motions now before us, the operative facts may be briefly summarized.[1]

At the Motions Hearing, the Government elicited the testimony of Michelle L. Leffelman ("Leffelman"), who is an Officer with the Bemidji Police Department, and who was involved in the investigation of the events that gave rise to the pending

---

[1]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."   As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.   Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.   See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 U.S. 1228 (1992); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

charges.  On February 16, 2005, Leffelman was speaking with someone in the Law Enforcement Center, when a female walked into the Center, and called from the entryway, that someone should go check an area around 10th Street, between Beltrami and Minnesota Avenues, because there was a man standing against a car with a screwdriver.  After finishing her conversation, Leffelman went to investigate the area described by the informant.  The anonymous female informant was given Leffelman's card, but the informant left before any other information was acquired and she had not been identified either before or after her statement as she stated that "she had to go."

Upon arriving in the referenced area, Leffelman proceeded to look for broken glass, or for signs of an attempted car break-in, but she did not encounter anyone meeting the description of the reported screwdriver-bearing male.  Leffelman continued down 10th Street, when, at about 3 o'clock p.m., she spotted, from roughly a half (½) block away, a parked vehicle with a male with a screwdriver seated in the driver's seat leaning out of the window.  The car also contained one (1) passenger. She pulled her squad car behind the parked vehicle and called in the license plate, which came back, later -- after she had begun speaking with Defendant -- as being registered to Spaulding Motors, a used car dealership in Bemidji.  She exited her squad car and approached the vehicle.

- 3 -

Leffelman spoke with the driver, told him of the report at the station about a man with a screwdriver, and asked him for some identification.  The driver identified himself as Christopher Colt McDonald, the Defendant.  Leffelman then called in the Defendant's name to the police dispatcher in order to determine if there were any outstanding Warrants for his arrest.  The Defendant appeared "jittery," and "nervous," and he had his head outside the window with a screwdriver in his hand, and was "messing with the window frame."  Leffelman asked the Defendant what he was doing, to which he replied that he was test-driving the vehicle and was trying to get the window back in its track.  He had responded politely, but he could not sit still.

Leffelman noted that the vehicle itself appeared to be in decent shape, "like a used-car," but was filled with a "few days worth" of McDonald's wrapping paper and shopping bags.  Western Union slips were visible from  bags located in both the front and back seats of the car.  As a consequence, Leffelman doubted that the car was actually being taken for a test-drive with the large amount of garbage inside of the car.  Even though the car had not been reported stolen, Leffelman thought that, perhaps, the car had not yet been discovered as missing by Spaulding Motors.  Her "gut feeling" was that cars were not usually test driven for "a few days," and that the presence of all the wrappers and garbage was suspicious.

John Sorensen, ("Sorensen"), who is a Sergeant with the Bemidji Police Department, arrived  to assist Leffelman after receiving a suspicious persons call. Sorensen began by asking the passenger in the Defendant's vehicle -- a Patrick Bailey ("Bailey") -- for identification, to which the passenger responded by producing a State-issued form of identification.  The passenger appeared irritated, but a check revealed no Warrants for Bailey's arrest.  Leffelman voiced her suspicions to Sorensen, which included her noticing the Western Union receipts in open bags inside the car.

Leffelman then asked the Defendant if there were any Warrants out for his arrest.  At that point, the Defendant gave Bailey a "large amount of cash," and stated that his mother had been the recipient of a settlement as she was a quadriplegic. Leffelman was suspicious from all the garbage and the statement that it was being test-driven for a "few days" and, when Leffelman received word back that the Defendant had a suspended drivers license and that there was an active Warrant for his arrest in Hubbard County, Minnesota, she then asked the Defendant to step out of the car, put the screwdriver down, and she placed him under arrest for the outstanding Warrant.  As there were no Warrants for Bailey, he was allowed to leave as he said he had "an appointment" with his girlfriend at a local attorney's office.

Leffelman proceeded to take the Defendant to Beltrami County Jail, and she left the vehicle, which the Defendant had been driving, to Sorensen. After Bailey left the scene, Sorensen began an inventory search of the car, pursuant to established policy of the Bemidji Police Department. See <u>Government Exhibit 4</u>. He discovered a large, clear plastic baggie under the front driver's seat, which contained a substance that field-tested positive as methamphetamine. Sorensen called Leffelman back, and she returned in the squad car after traveling for only about twenty (20) feet in the squad car with the Defendant. Sorensen reported his find to Leffelman. Leffelman proceeded to take the Defendant to the Beltrami County Jail, began the booking paperwork, and then proceeded back to engage in the inventory search. She and Sorensen waited at the site where the car was parked, and called in a Special Agent from the Task Force in order to continue with the search. Upon the Special Agent's arrival, they returned to the inventory search.

Other items found during the inventory search included a cigarette box containing two unsmoked cigarettes, together with a clear plastic bag containing a substance that also field-tested positive for methamphetamine on the floorboard next to the transmission. A blue, plastic digital scale was also found, in a shopping bag, on the floorboard of the passenger side of the vehicle. Leffelman had originally

thought the scale was a portable compact disc player before she opened the bag and examined further.  Finally, a cell phone, and a hotel key card, were also uncovered.

At the Hearing, the Government also elicited the testimony of Sorensen. Sorensen testified as to how he responded to the suspicious person's call, on February 16, 2005, and how he assisted Officer Leffelman on that same day.  Upon his arrival on the scene, Sorensen, based on his years of experience, thought that the Defendant was under the influence of drugs, as Sorensen noted that the Defendant was glassy-eyed and was acting "high."  Sorensen was unaware if there may have been a medical reason for the Defendant's appearance and demeanor.  Sorensen only spoke a minute or so with the Defendant, but he though that the Defendant's answers to his questions were not "crisp."

Sorensen testified that he had called Spaulding Motors to see if the car had been reported as stolen, but was unable to connect with anyone who could either confirm or deny whether the car had been released for a three-day test drive.

Sorensen also described his interactions with the passenger, Bailey, and the fact that the Defendant has passed a "wad of 20s, 50s, 100s" to Bailey which appeared suspicious.  After the Defendant was taken in the squad car by Leffelman, Bailey

came back to the scene briefly, and then left.  At this point, Sorensen commenced his initial inventory search which yielded the clear bag of methamphetamine under the driver's seat, where the Defendant had been seated.

Sorensen testified that after the departure of Bailey, Sorensen began the inventory search noted on the tow sheet.  See Government Exhibit 3.  Generally, Sorensen would put personal property of value on the tow sheet, and would otherwise list other evidence found on the evidence sheet.  He fills out the tow sheet form because it is required by departmental policy when vehicles are impounded or towed. Sorensen noted "suspected meth" on the tow sheet of February 16, 2005.  As related by Sorensen, he eventually was able to contact someone at Spaulding Motors, who confirmed that the Defendant was in legal possession of the car.

At the Hearing, the Government also called Robert Bushman, ("Bushman"), a Special Agent with the Minnesota Bureau of Criminal Apprehension, and Drug Enforcement Agency Task Force, to testify.  Bushman conducted an interview with the Defendant on August 5, 2005, and, while he was familiar with the facts leading up to the Defendant's arrest on February 16, 2005, he personally had not known the Defendant prior to the interview.  The Government entered into evidence both a photocopy of the Miranda warning which had been read to the Defendant at the

beginning of the interview, as well as a transcript and recording of the proceedings of the interview.

Bushman testified that the Defendant had been arraigned on Federal charges in July of 2005, for the Defendant's activities on February 16, 2005, and he was interviewed on the morning prior to his Initial Appearance . The interview occurred at an interview room in the Bemidji Police Department, at 9:45 o'clock a.m. The interview began with Bushman introducing himself, and telling the Defendant that he had been indicted. Bushman asked the Defendant if he had any questions, and read a <u>Miranda</u> warning to the Defendant, after which the Defendant acknowledged that he understood each of the rights explained to him. After the Defendant's acknowledgment, the following exchange occurred:

> Bushman:    You want to talk with me for a little bit here? Want me to explain what's goin' on to you?
>
> Defendant:  Yeah, I don't have to answer any questions here.
>
> Bushman:    You don't have to answer any questions.
>
> Defendant:  Okay.

The Defendant continued to speak with Bushman and he responded to Bushman's questions. Bushman testified, and the transcript has corroborated, that, during the

course of the interview, the Defendant did not ask for an attorney, and did not receive any threats or promises.  According to Bushman, no weapon was in view during that interview.  Bushman testified that, on the morning of the interview, the Defendant was cooperative and, while seeming a little distant at times, he did not appear under the influence of any substance, nor did he have any trouble in understanding Bushman's questions. The transcript does note that the Defendant was not awakened for breakfast prior to the interview.  Bushman was also aware, from reviewing the Defendant's record, that the Defendant had not graduated from high school.

The interview continued with the Defendant responding to Bushman's questions, and concluded with the following exchange:

> Defendant:   But I don't want to talk right now, I don't want to say no more.
>
> Bushman:     Okay, that's fine.

The interview concluded at that point with Bushman explaining the rest of the morning's activities.

III.  Discussion

A.    The Defendant's Motion to Suppress Evidence Obtained as a Result of a Search and Seizure.

The Defendant seeks to suppress the physical evidence that was obtained during the inventory search of his vehicle, which was conducted without the benefit of a Search Warrant.  The Defendant contends that any searches and seizures were performed without probable cause, and were lacking in any exigent circumstances.

1.    Leffelman's Questioning of the Defendant.

When Leffelman first noticed him, the Defendant was in a parked vehicle, was leaning out of the driver's side door, and was holding a screw driver. Since those observations paralleled the circumstances which were related by the anonymous tipster, Leffelman approached the Defendant's vehicle in order to ask him questions.  At that point, Leffelman was engaged in nothing more than a "consensual encounter" with the Defendant, as there is no evidence that the Defendant asked to leave, that Leffelman ordered the Defendant to stay, or that Leffelman employed any other means to constrain the Defendant during that initial encounter.  See United States v. Rayos-Parra, 312 F.3d 343, 346 (8th Cir. 2002)("Although there are significant restrictions upon police officers when conducting even minimally-intrusive

searches and seizures, United States v. Poitier, 818 F.2d 679, 682 (8th Cir. 1987),  cert.

denied, 484 U.S. 1006 (1988), consensual encounters between police officers and

private citizens do not invoke Fourth Amendment protections, Florida v. Bostick, 501

U.S. 429, 434-35 (1991)).

 As our Court of Appeals has recently explained:

> Not every encounter between a police officer and a citizen
> constitutes an unreasonable seizure under the Fourth
> Amendment:  "Obviously, not all personal intercourse
> between policemen and citizens involves 'seizures' of
> persons.  Only when the officer, by means of physical force
> or show of authority, has in some way restrained the liberty
> of a citizen may we conclude that a 'seizure' has occurred."
> Terry [v. Ohio], 392 U.S. [1,] 19 n. 16, [(1968)]; see also
> United States v. Mendenhall, 446 U.S. 544, 553-54
> (1980)("Only when such restraint is imposed is there any
> foundation whatever for invoking constitutional safeguards.
> The purpose of the Fourth Amendment is not to eliminate
> all contact between the police and the citizenry, but 'to
> prevent  arbitrary  and  oppressive  interference  by
> enforcement officials with privacy and personal security of
> individuals.'")(quoting United States v. Martinez-Fuerte,
> 428 U.S. 543, 554 (1976)).  The Supreme Court has made
> it abundantly clear "that mere police questioning does not
> constitute a seizure."  Florida v. Bostick, 501 U.S. 429, 434
> (1991).  For example, "law enforcement officers do not
> violate the Fourth Amendment by merely approaching an
> individual on the street or in another public place, by asking
> him if he is willing to answer some questions, by putting
> questions to him if the person is willing to listen, or by
> offering in evidence in a criminal prosecution his voluntary

answers to such questions." Id. (quoting Florida v. Royer,
460 U.S. 491, 497(1983) (plurality opinion)).
United States v. Barry, 394 F.3d 1070, 1074 (8th Cir. 2005); see also, United States v.
Ortiz-Monroy, 332 F.3d 525, 528 (8th Cir. 2003)(consensual encounter occurred when
an officer approached a parked car in a rest area, late at night, and asked questions
about the driver's identity).

"Some circumstances that inform the determination of whether a seizure took place

include: officers positioning themselves in a way that limits the person's freedom of

movement, United States v. White, 890 F.2d 1413, 1416 (8th Cir. 1989), cert. denied,

498 U.S. 825 (1990), the presence of several officers, the display of weapons by

officers, physical touching, the use of language or intonation indicating compliance

is necessary, the officer's retention of the person's property, or an officer's indication

that the person is the focus of a particular investigation, Ninety One Thousand Nine

Hundred Sixty Dollars, 897 F.2d [1457,] 1461 [(8th Cir. 1990)(citing [United States

v.] Mendenhall, 446 U.S. [544,] 554, 100 S.Ct. 1870 [(1980)], United States v.

Campbell, 843 F.2d 1089, 1093 (8th Cir. 1988), and United States v. Nunley, 873 F.2d

182, 185 (8th Cir. 1989)), see also Florida v. Royer, 460 U.S. 491, 503, n. 9

(1983)(noting that officers taking possession of defendant's airline ticket, luggage,

and identification contributed to determination defendant had been seized because

"[a]s a practical matter, Royer could not leave the airport without them"). United

States v. Johnson, 326 F.3d 1018, 1021-22 (8th Cir.2003), cert. denied, 540 U.S. 962 (2003).

Here, Leffelman did no more than inquire as to the Defendant's presence in the vehicle, his use of the screw driver, and his identity. She did not brandish her firearm, did not order the Defendant to exit the vehicle, or do anything thing else that would objectively demonstrate that compliance was mandatory. She did not touch the Defendant and, though for a brief time Sorensen was at the scene, he had no more than a minute conversation with the Defendant, as his questioning was directed at Bailey. The Defendant voluntarily disclosed his name, and birth date, upon Leffelman's questioning, and the running of that name, and birth date, disclosed that the Defendant was not licensed to drive, and had a prior Warrant issued for his arrest. Under these circumstances, we find no Fourth Amendment violation, as the entirety of Leffelman's exchange with the Defendant was a consensual encounter. See United States v. Barry, supra at 1076-78, citing United States v. Gipp, 147 F.3d 680, 684-85 (8th Cir. 1998), as "holding a highway patrol officer can approach a parked vehicle on a frontage road at 7:45 p.m. to see if there are any problems without offending the Fourth Amendment," United States .v Dockter, 58 F.3d 1284, 1287 (8th Cir. 1995), cert. denied, 516 U.S. 1122 (1996), as "ruling that individuals 'were not seized within the

meaning of the Fourth Amendment when [a sheriff's deputy] pulled his vehicle [directly] behind their parked car and activated his amber warning lights,'" and United States v. Kim, 25 F.3d 1426, 1430 n. 1 (9th Cir. 1994), cert. denied, 513 U.S. 1030 (1994), as "recognizing other circuit courts 'have consistently held that an officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure.'"

"Alternatively, we find that [Leffelman's] encounter with [the Defendant] was an investigatory stop and thus excepted from the Fourth Amendment's requirement that seizure be made pursuant to a warrant or predicated on probable cause." United States v. Ortiz-Monroy, supra at 528, citing Terry v. Ohio, 392 U.S. 1, 21-22 (1968). "A Terry investigatory stop allows an officer briefly to detain a citizen if the officer has a reasonable suspicion that 'criminal activity may be afoot.'" Id.   "Reasonable suspicion requires '"a particularized and objective basis" for suspecting the person stopped of criminal activity,'" and is not as demanding a standard as that of "probable cause."'" Thomas v. Dickel, 213 F.3d 1023, 1025 (8th Cir. 2000), cert. denied, 531 U.S. 1013 (2000), quoting Ornelas v. United States, 517 U.S. 690, 696 (1996), quoting, in turn, United States v. Cortez, 449 U.S. 411, 417 (1981).  Notably, "[a] reasonable suspicion may be justified even if there are innocent explanations for a

defendant's behavior when the circumstances are considered in the totality." United States v. Tuley, 161 F.3d 513, 515 (8th Cir. 1998), citing United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994)[en banc], cert. denied, 514 U.S. 1113 (1995). Further, a Terry stop is an investigative stop, which permits "an officer with reasonable suspicion to detain an individual to ask 'a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" United States v. Rodriguez-Arreola, 270 F.3d 611, 616 (8th Cir. 2001), quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984).

"The validity of an investigatory stop under the Fourth Amendment turns on the detailed facts of the case at hand," and "[w]e must consider 'the totality of the circumstances -- the whole picture.'" United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002), quoting United States v. Cortez, 449 U.S. 411, 417 (1981); see also, United States v. Hanlon, 401 F.3d 926, 929 (8th Cir. 2005). "Also relevant are those inferences and deductions made by officers under the particular circumstances since law enforcement officials are 'trained to cull significance from behavior that would appear innocent to the untrained observer.'" United States v. Bailey, 417 F.3d 873, 877 (8th Cir. 2005), quoting United States v. Poitier, 818 F.2d 679, 683 (8th Cir. 1987), cert. denied, 484 U.S. 1006 (1988). Our inquiry, therefore, does not require us to

"rule out the possibility of innocent conduct."  United States v. Logan, 362 F.3d 530, 534 (8th Cir. 2004).   Indeed, "a reasonable but mistaken belief may justify an investigative stop."  Id., citing United States v. Johnson, 326 F.3d 1018, 1022 (8th Cir. 2003), cert. denied, 540 U.S. 962 (2003).

Here, an anonymous tip prompted Leffelman to search for a vehicle, in the vicinity of 10th Street, between Beltrami and Minnesota Avenues, beside which a man would be holding a screw driver.   Leffelman observed such a vehicle, and man holding a screw driver, in the general area of the anonymous tip, thereby confirming at least one aspect of the tip.   While an anonymous tip, standing alone and unconfirmed, would not provide Leffelman with a reasonable suspicion justifying an investigative stop, in Alabama v. White, 496 U.S. 325, 331 (1990), the Supreme Court "held that a sufficiently corroborated anonymous tip may establish reasonable suspicion justifying an investigative stop."  United States v. Olson, 262 F.3d 795, 798 (8th Cir. 2001).   Here, the tip, as corroborated by Leffelman's observations, and the presence of a screw driver in the Defendant's hand, were sufficient to justify Leffelman's investigative questioning of the Defendant, even if we concluded that a consensual encounter was not at hand.

Of course, while screw drivers can have innocent uses, they can also be employed in burglaries, and Leffelman testified that the screwdriver could have been a tool used in breaking into the car.  See United States v. Watts, 7 F.3d 122, 126 (8th Cir. 1993)(noting that bolt cutters and screwdrivers are "items commonly associated with a burglary"), cert. denied, 510 U.S. 1078 (1994).   "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct."   United States v. Arvizu, 534 U.S. 266, 277 (2002), citing Illinois v. Wardlow, 528 U.S. 119, 125 (2000); see also, United States v. Logan, supra at 534 (same) .  In addition, Leffelman ran a title search on the vehicle, and found that it was registered to Spaulding Motors, the Defendant appeared nervous and fidgeting, there was accumulated trash, in the nature of McDonald's burger wrappings, in the back of the car.

Again, we recognize that innocent explanations could be attached to each of Leffelman's observations.  For example, the vehicle had not been reported as stolen, and the accumulated trash could have been explained consistent with the Defendant's statement that he was test-driving the vehicle for a period of three days, but Leffelman found the presence of such a large amount of trash, during a test-drive, as suspicious, and found a three-day test-drive as suspicious.   When viewed from Leffelman's

perspective, and not with hindsight, we cannot say that Leffelman's suspicions were unreasonable, or not articulable.  See United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005), cert. denied, --- U.S. ---, 125 S.Ct. 2921 (2005)("The determination of whether probable cause [or reasonable suspicion] existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at that time."), quoting with added parenthetical, United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999).  Moreover, she noted what appeared to her to be a blue compact disk player in a bag near the front passenger seat, and she testified that, in Bemidji, there were a lot of compact disk players stolen from automobiles.  Again, when considered in totality, we find Leffelman's suspicions reasonable.  See United States v. Maltais, 403 F.3d 550, 555 (8th Cir. 2005)("[Police officers] properly took some facts which might individually be innocent and viewed them in context and in light of experience to find that the totality of the circumstances gave rise to a reasonable suspicion."); see also, United States v. White, 42 F.3d 457, 460 (8th Cir. 1994)("Although there is a possible innocent explanation for each of the factors, as a totality they created a reasonable suspicion justifying further investigation reasonable in scope.").[2]

---

[2]In this analysis, we have not overlooked the fact that each of the Defendant's explanations of innocent conduct proved to be correct.  He was given permission to

(continued...)

At this point, Leffelman asked for the Defendant's identification, and he verbally provided her with his name and birth date.   Running a check on that information disclosed that the Defendant was not licensed to drive, and that he had an outstanding Warrant for his arrest, and the Defendant was then placed into custody. We find no basis to suppress evidence uncovered in the initial encounter, between Leffelman and the Defendant, as we find no Fourth Amendment violation. Accordingly, the Defendant's Motion to Suppress should be denied.

      2.    <u>Sorensen's Search and Seizure of Evidence From the Defendant's Vehicle</u>.

      a.    <u>Standard of Review</u>. "Searches without a warrant are per se unreasonable subject to a few well established exceptions."   <u>United States v. Hill</u>, 386 F.3d 855, 858 (8th Cir. 2004).   One exception is the search incident to a valid arrest. See, e.g., <u>New York v. Belton</u>, 453 U.S. 454, 461 (1981); <u>Chimel v. California</u>, 395 U.S. 752, 762 (1969); <u>United States v. Klein</u> , 13 F.3d 1182, 1184 (8th Cir. 1994), cert. denied, 512 U.S. 1226 (1994).   As our Court of Appeals has explained:

---

[2](...continued)
test drive the automobile, which would explain for the accumulated trash, and he had not employed the screw driver in order to break into that vehicle. As we have pointed out, however, a "reasonable but mistaken belief may justify an investigative stop." <u>United States v. Bailey</u>, 417 F.3d 873, 877 (8th Cir. 2005), citing <u>United States v. Johnson</u>, 326 F.3d 1018, 1022 (8th Cir. 2003), cert. denied, 540 U.S. 962 (2003).

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect.

Conrod v. Davis , 120 F.3d 92, 96 (8th Cir. 1997), cert. denied, 523 U.S. 1081 (1998), citing United States v. Robinson, 414 U.S. 218, 235 (1973).

"A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."   Id.; see also, Curd v. City Court of Judsonia, Arkansas, 141 F.3d 839, 842 (8th Cir. 1998), cert. denied, 525 U.S. 888 (1998), ("Warrantless searches incident to a custodial arrest are 'justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained.'"), quoting United States v. Edwards, 415 U.S. 800, 802-03 (1974).

A search incident to arrest may include all areas within the immediate control of the person, including the passenger compartment of an automobile occupied by an arrestee at the time of his arrest.   New York v. Belton, supra at 460.  The scope of a permissible vehicle search further extends to all containers within the passenger compartment of the automobile, including "glove compartments, consoles, and other receptacles located anywhere within the passenger compartment, as well as luggage,

boxes, bags, and the like." Id. at 460, n. 4; accord United States v. McCready, 774

F.2d 868, 871-872 (8th Cir. 1985)(glove compartment); see also, United States v.

Poggemiller, 375 F.3d 686, 688 (8th Cir. 2004), cert. denied, --- U.S. ---, 125 S.Ct.

1614 (2005) (trap door which leads to an area connecting the trunk of the vehicle to

the vehicle's back seat); United States v. Caldwell, 97 F.3d 1063, 1067 (8th Cir.

1996)(hatchback area); United States v. Veras, 51 F.3d 1365, 1372 (7th Cir. 1995),

cert. denied, 516 U.S. 999 (1995) (secret compartments located within the back seat).

Generally, however, the trunk of a vehicle may not be searched incident to a valid

arrest. New York v. Belton, supra at 460, n. 4. Further, an officer need not have had

contact with an arrestee, prior to his exit from the vehicle, so long the search of the

automobile is contemporaneous with the arrest. United States v. Poggemiller, supra

at 687, citing Thorton v. United States, 541 U.S. 615, 124 S.Ct. 2127 (2004).

A second exception allows for inventory searches of vehicles which have been

impounded pursuant to standard police procedure. See United States v. Betterton, 417

F.3d 826, 830 (8th Cir. 2005)("To be constitutional, '[a] warrantless inventory search

must be done pursuant to "standard police procedures" and for the purpose of

"protecting the car and its contents."'"), quoting United States v. Best, 135 F.3d 1223,

1225 (8th Cir. 1998). As the Supreme Court explained, in South Dakota v. Opperman,

428 U.S. 364, 368-69 (1976), "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions," Cady v. Dombrowski, [413 U.S. 433, 441 (1973)], automobiles are frequently taken into police custody" and, when they are, the police "generally follow a routine practice of securing and inventorying the automobiles' contents." These inventorying policies were developed to protect "the owner's property while it remains in police custody," to protect "the police against claims or disputes over lost or stolen property," and to protect "the police from potential danger." Id. at 369; see also, United States v. Mayfield, 161 F.3d 1143 (8th Cir. 1998), cert. denied, 526 U.S. 1045 (1999).

The Supreme Court has determined "that inventories pursuant to standard police procedures are reasonable" under the Fourth Amendment. South Dakota v. Opperman, supra at 372; see also, Colorado v. Bertine, 479 U.S. 367, 374 (1987), United States v. Mayfield, supra at 1145, United States v. Hartje, 251 F.3d 771, 775-76 (8th Cir. 2001), cert. denied, 534 U.S. 1116 (2002); see also, United States v. Wallace, 102 F.3d 346, 348 (8th Cir. 1996)("In other words, '[a]s long as impoundment pursuant to the community caretaking [or public safety] function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking [or public safety] motives will not invalidate the search.'"), quoting United States v.

- 23 -

Marshall, 986 F.2d 1171, 1175-76 (8th Cir. 1993); see also, Untied States v. Betterton, supra at 830 ("[T]he district court did not err in concluding that the decision to impound was based on the legitimate concern of traffic safety and was 'not merely "a ruse for general rummaging in order to discovery incriminating evidence."'"), quoting United States v. Petty, 367 F.3d 1009, 1012 (8th Cir. 2004); United States v. Davis, 882 F.2d 1334, 1338 (8th Cir. 1989), cert. denied, 494 U.S. 1027 (1990) ("To pass constitutional muster, the search also must be conducted pursuant to standard police procedures.").

      b.   <u>Legal Analysis</u>.   The Defendant suggests that the evidence obtained as a result of the search and seizure of the vehicle, subsequent to the Defendant's arrest, should be suppressed.  We disagree.

The search of the Defendant's vehicle was conducted soon after the Defendant's arrest, which we have already recognized as lawful.  The evidence obtained during that search was discovered in the driver and passenger compartments of the vehicle that had recently been occupied by the Defendant. Thus, under <u>Belton</u>, the search of the Defendant's vehicle was permissible as incident to his arrest.

In addition, Sorensen's search of the vehicle was permissible as an inventory search, prior to the towing of the vehicle.  The uncontradicted evidence in the Record

reveals that the Bemidji Police Department has a policy of impounding vehicles, where a traffic stop results in the absence of a licensed driver who could take custody of the vehicle. Such a situation was presented here, as the car's other passenger, Bailey, left and there were no other passengers in the vehicle. At the time, the registered owner of the car, Spaulding Motors, could neither confirm nor deny whether the car was properly in the possession of the Defendant. Therefore, Sorensen was fully justified in his decision to impound the vehicle.

Sorensen further testified, as corroborated by the Government's Exhibits, that it was the policy of the Bemidji Police Department to conduct inventory searches of impounded vehicles. As previously stated, the Supreme Court has upheld inventory searches that are conducted pursuant to such policies. See, <u>Colorado v. Bertine</u>, supra at 374. Therefore, the search of the vehicle was also lawful as an inventory search, and we deny the Defendant's Motion to Suppress any of the physical evidence that had been acquired through search and seizure.

B.   <u>The Defendant's Motion to Suppress Statements, Admissions, and Answers</u>.

The Defendant has also challenged the admissibility of the statements that he made to Bushman, during the interview of August 5, 2005, and argues that the statements were made without the assistance of counsel in violation of the

Defendant's Fifth and Sixth Amendment rights.  The Defendant also contends that the statements, admissions, and answers, were not given freely and voluntarily, but were obtained by impermissibly deceptive methods of interrogation, and that he was unlawfully in custody in violation of the Fourth Amendment.  We disagree with each contention.

       1.     Standard of Review.  Under the Fifth Amendment, government agents are not required to administer Miranda warnings to everyone they question. See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984).

     If a person is subjected to a custodial interrogation, he or she "has the right to consult with an attorney and to have counsel present during questioning." Davis v. United States, 512 U.S. 452, 457 (1994).  To exercise that right, however, a suspect "must unambiguously request counsel," which "'requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the

- 26 -

assistance of an attorney.'" Id., at 459, quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991).   Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal * * * [such] that the suspect might be invoking his right to counsel, our precedents do not require the cessation of questioning." Id.

Under "the Sixth Amendment[,] right to counsel 'does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Von Kahl v. United States, 242 F.3d 783, 789 (8th Cir. 2001), cert. denied, 534 U.S. 941(2001), quoting McNeil v. Wisconsin, supra at 175.   As a result, "[t]he Sixth Amendment prohibits the use at trial of statements deliberately elicited from a suspect after he has been indicted and in the absence of counsel.   United States v. Fellers, 397 F.3d 1090, 1095 (8th Cir. 2005), petition for cert. filed (May 16, 2005), citing Massiah v. United States, 377 U.S. 201, 206 (1964).   As our Court of Appeals has explained:

> Furthermore, because "[t]he State's decision to take an additional step and commence formal adversarial proceedings against the accused does not substantially increase the value of counsel to the accused at questioning or expand the limited purpose that an attorney serves when the accused is questioned by authorities," there is no significant difference between a lawyer's usefulness to a suspect during pre-indictment custodial interrogation and

- 27 -

> his usefulness at post-indictment questioning. [Patterson v.
> Illinois, 487 U.S. 285,] 298-99 [(1988)].   An accused is
> thus permitted to waive his right to counsel as an initial
> matter after receiving proper Miranda warnings.  Id. at 293-
> 94 * * *.  Such warnings alert the accused to the possible
> consequences of going forward without counsel during
> questioning.  Id. at 293 * * *.

United States v. Fellers, supra at 1096-97.

As a result, under either Fifth or Sixth Amendment analysis, if a Miranda warning is

provided to an accused, who is unrepresented, after an Indictment, or after being taken

into custody, the issues conflate to whether the waiver of the right to counsel was

knowing and voluntary.   The Supreme Court has recognized that, in order for a

confession to be admitted into evidence, it must be voluntary if it is to satisfy the

Fifth, or Sixth Amendment's, right against self-incrimination.   See, Dickerson v.

United States, 530 U.S. 428, 433-34 (2000).   For a confession to be considered

voluntary, a Court must examine "'whether a defendant's will was overborne' by the

circumstances surrounding the giving of a confession."   Dickerson v. United States,

supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of
> all the surrounding circumstances -- both the characteristics
> of the accused and the details of the interrogation."
> [Schneckloth v. Bustamonte, 412 U.S. at 226.]  See also
> Haynes [v. Washington, 373 U.S. 503, 513] (1963);

- 28 -

> Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961)("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").    The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly, 479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693 (listing the applicable considerations).

        2.    Legal Analysis.  As an initial matter, no one disputes that the Defendant was in custody at the time that he made his statements during the interview of August 5, 2005.  We have also determined that the Defendant was lawfully arrested pursuant to the Hubbard County Arrest Warrant, and that the subsequent Federal Indictment

- 29 -

was issued in July of 2005.  Since Bushman questioned the Defendant, while he was not represented by counsel, and after he was indicted on Federal charges, the issue devolves to whether the Defendant's waiver was knowing and voluntary.  We conclude that it was.

After introducing himself and informing the Defendant of the nature of the immediate proceedings, Bushman read the Defendant his <u>Miranda</u> rights, which the Defendant expressly waived.  The Defendant also answered affirmatively that he understood each of the rights that had been explained to him.  Before any questioning ensued, and in response to Bushman's offer to explain what was going on, the Defendant  stated, "Yeah, I don't have to answer any questions here."  Bushman confirmed this, and the interview proceeded with the Defendant cooperating fully.

The Defendant implies that, by that exchange, he invoked his right to counsel, when he uttered "Yeah, I don't have to answer any questions," which the Defendant characterizes as the functional equivalent of a request not to answer questions without the presence of an attorney.  We find nothing to support any such implication.  At best, the Defendant's statement is a simple declaration that he understood, in a generalized way, the legal effect of a <u>Miranda</u> warning -- namely, that he need not answer any of Bushman's questions.  Notably, the Defendant did not then refuse to

answer any questions, until he did so at the end of the interview, when the questioning

promptly terminated.  He never requested legal counsel to be present, however

indirectly, and his interview continued until the Defendant caused the questioning to

stop, when he stated "But I don't want to talk right now, I don't want to say no more."

Plainly, the Defendant knew of his right to end the Bushman's questioning as, when

he wanted to, he exercised that right.[3]

In addition, we have been presented with no credible showing that the

Defendant's will was improperly overborne by Bushman, or that the statements he

made were involuntary.  The interview lasted for just over twenty-four (24) minutes,

and the Defendant demonstrated no inability to process the information, or to

understand what was being asked of him.  The Defendant has prior familiarity with

matters of criminal justice, and nothing has been offered to establish a level of

coercion which would be consistent with an overborne will.  We understand that the

Defendant had not been served breakfast on the day of his interview, see Government

Exhibit 2a, at p. 4, but he never asked for food or refreshments during the course of

the interview.  Our review of the interview discloses no threats, or promises, which

---

[3]At one point in the interview, the Defendant asked Bushman if he could "make
a phone call and say goodbye to my relatives," Government Exhibit 2a, at p. 3, but
that was not a request, directly or indirectly, to contact an attorney.

were made by Bushman to the Defendant, and Bushman made clear that he had no authority to make any promises to the Defendant.  Id. at p. 8.

In sum, we find that the Defendant's statements to Bushman were both knowing and voluntary, after a proper Miranda warning, and we recommend that his Motion to Suppress Statements, Admissions, and Answers, be denied in its entirety.

NOW, THEREFORE, It is --

RECOMMENDED:

1.    That the Defendant's Motion to Suppress Evidence Obtained as a Result of a Search and Seizure [Docket No. 23] be denied.

2.    That the Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 25] be denied.


Dated:  September 8, 2005           s/Raymond L. Erickson
                                    Raymond L. Erickson
                                    UNITED STATES MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by**

**no later than September 27, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than September 27, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.